IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-01469-RBJ

AQUA-HOT HEATING SYSTEMS, INC.,

      Plaintiff,

v.

GORMAN-RUPP COMPANY,

      Defendant.

---

ORDER

---

There are four motions before the Court. First, defendant The Gorman-Rupp Company ("Gorman-Rupp") has filed a motion for summary judgment against plaintiff Aqua-Hot Heating Systems, Inc. ("Aqua-Hot"). ECF No. 43. For reasons stated below, that motion is GRANTED in part and DENIED in part. Second, defendant has filed a motion for sanctions for spoliation of evidence against plaintiff. ECF No. 42. That motion is DENIED. Third, defendant moves to strike, in part, plaintiff's expert witness disclosures. ECF No. 44. That motion is GRANTED in part and DENIED in part. Fourth, plaintiff has filed a motion in limine to restrict defendant's two expert opinions. ECF No. 49. That motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. <u>The Parties' Dispute</u>.

This case involves a contractual dispute between two merchants, Aqua-Hot and Gorman-Rupp. Aqua-Hot manufactures heating and water heating systems for use in recreational vehicles and trucks. Complaint, ECF No. 1, at 2. It then sells the water heating systems to third

parties for use in the vehicles.  *Id.*  In 2012 Aqua-Hot was contemplating placing a large order for pumps, a component of its heating systems, with Gorman-Rupp, which is a pump manufacturer.  Before proceeding with a purchase, however, plaintiff spent several months inspecting and testing the pumps.  *Id.*

On October 17, 2012 defendant provided plaintiff with a price quote for what the parties refer to as the "'105 pumps."  *See* ECF No. 43-6, Ex. 6.  The price quote included a description of the pump; a designated quantity of 8,000 pumps; a unit price of $39.87; and Gorman-Rupp's "Terms and Conditions of Sale" which was part of what appears to be its standard form price quote document.  On January 10, 2013 plaintiff submitted a purchase order for 8,000 '105 pumps.  ECF No. 43-7.  The purchase order includes "Aqua-Hot Purchase Order Terms and Conditions," *id.* at 5, which, like defendant's terms and conditions, are found in a printed form that appears to be a part of Aqua-Hot's standard form used for purchases.  On January 11, 2013 defendant returned an order acknowledgment form to plaintiff.  ECF No. 43-9 at 2.  Defendant did not reattach its terms and conditions, but it did explicitly incorporate Gorman-Rupp's standard terms and conditions into the acknowledgment.  *Id.* at 3.  At some point later plaintiff placed an order for an additional 8,000 '105 pumps.  Neither party can locate a purchase order for this transaction, but defendant has produced an order acknowledgment form dated March 12, 2014.  ECF No. 43 at 3.

Aqua-Hot alleges that the '105 pumps failed at a rate of about 30% after installation.  It disassembled and examined failed pumps returned by customers and determined that they contained "debris, cracked magnets, shorted circuit boards, and cracked housings in the '105 pumps."  ECF No. 1 at 2.  Aqua-Hot informed defendant of the issues it was having, and to

rectify the problem, Gorman-Rupp offered to replace the failed pumps with an updated pump model ("'108 pumps"). *Id.* at 3.

On October 28, 2014 plaintiff modified its existing order to swap out the remaining '105 pumps scheduled for delivery with '108 pumps. ECF No. 43 at 4. On January 22, 2015 plaintiff submitted another purchase order for an additional 8,000 '108 pumps. *Id.*; ECF No. 43-12, Ex. 12. The following day, defendant responded with an order acknowledgment form. ECF No. 43-13, Ex. 13. On July 13, 2015 plaintiff accepted its last shipment of '108 pumps. ECF No. 43 at 4. On August 12, 2015 plaintiff's product purchaser sent an email to defendant cancelling the remaining balance of pumps on its final two purchase orders. ECF No. 43-14, Ex. 14.

In September 2015 Aqua-Hot was contemplating legal action based on losses it had sustained because of the failed '105 pumps. Mot. Summ. J., ECF No. 43 at 6. Before filing suit, however, Paul Harter, Aqua-Hot's president, met with Michael Hill, Gorman-Rupp's president, to discuss the pump problems and Aqua-Hot's associated losses. *Id.* Allegedly to appease Aqua-Hot, an existing customer, Mr. Hill agreed to refund plaintiff for the loss of 2,439 pumps. ECF No. 43-19, Ex. 19.

Unfortunately, pump issues continued into 2016. Aqua-Hot customers continued to complain and file warranty claims against plaintiff after their water heaters failed. ECF No. 1 at 3. Again, plaintiff determined that defendant's pumps—this time the '108 pumps—were the cause of the failures. *Id.* Like its predecessor, the '108 pump failed at a rate of about 30%. In total, plaintiff claims it has incurred over $1 million in out-of-pocket expenses because of the pump failures.

Nevertheless, Gorman-Rupp received no communications from Aqua-Hot between its refund payment made in September 2015 and a demand letter that it received on March 6, 2017. ECF No. 43 at 8.

## B.  **The Conflicting Documents.**

As I have noted, the parties did not negotiate and execute a written contract, as such, for the purchase and sale of the pumps.  Instead, they exchanged price quotes, purchase orders, and acknowledgement of purchase forms.  Some of the terms in Gorman-Rupp's certain standard "Terms and Conditions of Sale" conflicted with terms and conditions in the "Aqua-Hot Purchase Order Terms and Conditions."  It appears to the Court that each party paid little, if any, attention to the other party's printed form.  There is no evidence that either party acknowledged the other's terms and conditions, agreed to them, rejected them, or made any effort to negotiate a reconciliation of them.  Rather, it appears to me that they were eager to do a deal which was likely viewed as lucrative to both sides, and the terms and conditions, likely drafted by the parties' respective lawyers and shaped to be as favorable to their respective clients as possible, went by the wayside.

## C.  **Procedural History.**

Plaintiff filed this lawsuit on June 16, 2017.  It alleged six claims: (1) breach of contract; (2) negligence; (3) willful and wanton breach of contract; (4) breach of express warranty; (5) breach of the implied warranty of merchantability; and (6) breach of the implied warranty of fitness for a particular purpose.  ECF No. 1 at 4–8.  On September 28, 2018 defendant filed a motion for summary judgment.  ECF No. 43.  Plaintiff filed a response brief, ECF No. 46, and defendant filed a reply brief, ECF No. 50.  The motion has been fully briefed and is ripe for review.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  This Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Concrete Works of Colorado, Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III.  ANALYSIS

**A.  <u>Existence and Terms of the Parties' Contract.</u>**

1.  <u>The Uniform Commercial Code ("UCC") Applies</u>.

This case involves a sale of goods between two merchants.  Thus, the UCC applies to this dispute to the extent that state law has adopted the UCC.  Here, although the parties dispute whether Ohio or Colorado law applies, resolution of this dispute for the most part does not impact my legal analysis concerning contract interpretation because both parties agree that Ohio and Colorado have codified UCC § 2-207.  ECF No. 43 at 11–12; ECF No. 46 at 7; *see also* Colo. Rev. Stat. § 4-2-207; Ohio Rev. Code § 1302.10.  One area where choice of law does make a difference is discussed later in this order.

2. <u>The Contract</u>.[1]

Neither party denies that a contract existed at some point. However, they disagree as to when the contract was formed and which terms govern. Contract interpretation is generally a question of law for the court to decide. *See, e.g., I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986).

Defendant argues that its price quotation was an offer, and that its terms and conditions accompanying the quote were part of the offer. ECF No. 43 at 11. Defendant further argues that plaintiff accepted the offer within the 90-day timeframe specified in the offer by submitting a purchase order even though plaintiff attached its own terms and conditions which included additional or different terms. *Id.* Defendant submits that its terms concerning warranty and limitations on liability control because plaintiff's terms and conditions are silent on warranty and liability. *Id.* at 12. Finally, defendant adds that its terms and conditions continued to govern plaintiff's subsequent orders because plaintiff simply modified its existing order. *Id.*

---

[1] In this section of my order, I refer to all three sections of UCC § 2-207. To assist the reader, UCC § 2-207 is cited in its entirety below.

> § 2-207. Additional Terms in Acceptance or Confirmation.
> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

In its response brief plaintiff essentially concedes that defendant's price quote was an offer. Plaintiff's main argument is that its purchase order was a counteroffer per UCC § 2-207(1) because plaintiff's terms and conditions required defendant to accept plaintiff's terms and conditions.[2] ECF No. 46 at 6. According to the plaintiff, defendant accepted plaintiff's counteroffer when it issued a series of order acknowledgments. *Id.* at 9. Plaintiff then argues that defendant's terms and conditions cannot control because defendant's order acknowledgment failed to attach those terms and conditions. *Id.* at 6.

In the alternative, plaintiff argues that its purchase order was not a "definite and seasonable expression of acceptance or written confirmation which [was] sent within a reasonable time" per UCC § 2-207(1). *Id.* at 8. Plaintiff notes that it required three months of testing prior to assenting to the offer, and thus, it didn't accept the offer within a reasonable time. *Id.* This argument leads plaintiff to UCC § 2-207(3). Plaintiff believes that the parties' conduct recognized the existence of a contract per UCC § 2-207(3). *Id.* at 7. Therefore, because there was no agreement as to the warranties or limitations of remedies, those provisions are "knocked out" of the contract. *Id.*

Two cases from this Circuit are instructive here. In *Daitom, Inc. v. Pennwalt Corp.*, the defendant submitted a price quote for the sale of rotary vacuum dryers. 741 F.2d 1569, 1571 (10th Cir. 1984). The defendant attached terms and conditions and explicitly made the terms an

---

[2] The first paragraph of plaintiff's purchase order terms and conditions provided,

> Seller's acceptance of Buyer's purchase order relating to offered products or services is *expressly made conditional* on Seller'[s] acceptance of these terms and conditions which are in lieu of and shall supersede any additional or different terms and conditions contained in buyer's purchase order or other document or communication pertaining to buyers order for the products or services.

ECF No. 43-7, Ex. 7 (emphasis added).

integral part of its proposal. *Id.* The defendant's terms imposed a one-year period of limitations for warranties. *Id.* at 1572. A month later, the plaintiff submitted a purchase order for the vacuum dryers. *Id.* The plaintiff's purchase order included standard terms and conditions on the back of its order form. *Id.* The most relevant provisions in the plaintiff's terms and conditions were the provisions reserving all warranties and remedies available at law. *Id.* at 1573. Almost two years after the parties exchanged documents, the plaintiff notified the defendant that the dryers had stopped working. *Id.* at 1572. Unable to resolve the issues, the plaintiff sued. *Id.*

The plaintiff argued that its purchase order didn't constitute an acceptance because its purchase order explicitly made acceptance conditional on the defendant's assent to the additional or different terms. *Id.* at 1573. Instead, the contract was formed by the parties' conduct, and the resulting contract consisted solely of the written terms agreed upon. *Id.* Any gaps in the contract would be filled by relevant UCC provisions. *Id.* Alternatively, if the purchase order did constitute acceptance of the proposal, the plaintiff argued` that all conflicting terms between the two merchants' terms and conditions were "knocked out" of the contract. *Id.* Thus, the contract solely consisted of the agreed upon terms and any supplemental terms. *Id.*

The Tenth Circuit found that the defendant's price quote constituted an offer, and that the plaintiff's purchase order constituted acceptance. *Id.* at 1575. The court ruled that the plaintiff's expressly conditional "boilerplate" terminology did not preclude the formation of a contract per UCC § 2-207(1). *Id.* at 1575–76. In so ruling, the Tenth Circuit determined that the plaintiff's purchase order was a "conditional acceptance." *Id.* at 1577. To be a valid counteroffer, "the offeree must explicitly communicate his or her unwillingness to proceed with the transaction unless the additional or different terms in its response are accepted by the offeror." *Id.* In the

end, the *Daitom* court recognized the existence of the contract, knocked out any conflicting terms, and used UCC gap-fillers to complete the contract. *Id.* at 1578–80.

Next, in *Westinghouse Elec. Corp. v. Nielsons, Inc.*, the seller submitted a price quotation to sell electrical material to the buyer. 647 F. Supp. 896, 897–98 (D. Colo. 1986). The seller attached standard terms and conditions to the quote. *Id.* at 898. In response, the buyer submitted a purchase order to buy the items. *Id.* Like the seller, the buyer attached its own list of standardized conditions. *Id.* Paragraph 12 of the buyer's conditions stated, "Execution of this agreement constitutes an acceptance expressly limited to the terms herein and any additional or different terms suggested by Seller are hereby rejected unless expressly agreed to in writing by Buyer." *Id.* Unlike in *Daitom*, however, the parties disputed whose terms and conditions would apply. *Id.* The court used Colo. Rev. Stat. § 4-2-207 (Colorado's codification of UCC § 2-207) to determine the terms of the contract.

The court found that the seller's quotation was an offer, and then found that the buyer's purchase order constituted an acceptance. Relying on *Daitom*, the court determined that paragraph 12's language did not invalidate the acceptance. *Id.* at 900. Thus, under Colo. Rev. Stat. § 4-2-207(1), the parties formed a contract. *Id.* at 899–900. The court then proceeded to § 4-2-207(2), where it found that all three exceptions applied. Therefore, "[n]either set of terms c[ould] become part of the contract between these two merchants . . . ." *Id.* at 900. Having found that neither party's terms were added to the contract under § 4-2-207(2), the court looked to § 4-2-207(3). *Id.* at 901. The court determined that the parties' conduct clearly recognized the existence of a contract. *Id.* Relying on *Daitom* yet again, the court read both parties' terms and conditions into the contract, but it eliminated any conflicting terms. *Id.*

With these two cases in mind, I turn to the facts of this case. A price quote is normally not an offer. Instead, courts typically treat a price quote as an invitation to negotiate or bargain. *Master Palletizer Sys., Inc. v. T.S. Ragsdale Co.*, 725 F. Supp. 1525, 1531 (D. Colo. 1989). However, some price quotations are so detailed that a court may deem them an offer. *See id.* In this case, I find that defendant's price quote was sufficiently detailed. Gorman-Rupp's offer included the specific type of good (the '105 pump), a quantity of 8,000 pumps, a price of $39.87, and it stated that the quote would be valid for 90 days. Therefore, I conclude that defendant's price quote constituted a legal offer.

Near the end of the 90-day acceptance window, plaintiff submitted a purchase order for 8,000 '105 pumps for $39.87. Under most circumstances, plaintiff's purchase order would easily constitute an acceptance of defendant's offer. But in this case, plaintiff argues that its purchase order was a counteroffer because the first paragraph of the terms and conditions contains conditional language. Per UCC § 2-207(1), plaintiff argues that this paragraph's conditional language precludes acceptance and turns the purchase order into a counteroffer.

Although the express language of UCC § 2-207(1) arguably could support plaintiff's position, the *Daitom* and *Westinghouse* courts rejected that argument. Plaintiff did not "explicitly communicate [its] unwillingness to proceed with the transaction unless the additional or different terms in its response [were] accepted by the offeror." *Daitom*, 741 F.2d at 1577. To the contrary, plaintiff willingly proceeded with the transaction without ever discussing its terms and conditions with defendant. I find that plaintiff's purchase order constituted a valid acceptance. I now must determine the terms of the agreement.

Per UCC § 2-207(2), because both parties are merchants, plaintiff's additional terms found in its terms and conditions become part of the contract unless defendant's "offer expressly

limits acceptance to the terms of the offer" or plaintiff's additional terms "materially alter" the contract. UCC § 2-207(2)(a)–(b). In this case, both exceptions apply.

First, the only paragraph on defendant's one-page price quote states, "This quotation is made subject to our standard Terms & Conditions of Sale as printed on the reverse side of this sheet." ECF No. 43-6, Ex. 6. Further, defendant's one-page order acknowledgment form states, "This acceptance of your order and any sale or delivery of goods or services there under is subject to the 'terms and conditions of sale' which are appended by the reference to and made part of this order acknowledgment." ECF No. 43-9, Ex. 9.

Second, the different terms[3] found in plaintiff's purchase order do attempt to materially alter the terms of the contract. There are two relevant provisions in plaintiff's terms and conditions. The terms state that they "supersede any additional or different terms and conditions" found in defendant's terms and conditions. ECF No. 43-7, Ex. 7. And, they include a governing law provision stating that Colorado law shall apply. *Id.*

Plaintiff's governing law section does not materially alter the contract. However, the provisions overriding defendant's terms and conditions do. Courts typically hold that warranty disclaimers and liability limitations materially alter contracts under UCC § 2-207(2)(b). *See Leica Geosystems, Inc. v. L.W.S. Leasing, Inc.*, 872 F. Supp. 2d 1191, 1200 (D. Colo. 2012) (collecting case law and applying it to Colo. Rev. Stat. § 4-2-207(2)(b)). A competing provision attempting to eliminate such disclaimers materially alters the contract.

In sum, neither party's terms may be added to the contract under UCC § 2-207(2). *See Westinghouse*, 647 F. Supp. at 900. I therefore must look to § 2-207(3).

---

[3] Although Colo. Rev. Stat. § 4-2-207(2) uses the phrase "additional terms," comment three to § 4-2-207 uses the phrase "additional or different terms." Judge Kane addressed this inconsistency in *Westinghouse*, and he made the assumption that "subsection (2) cover[ed] 'different' terms as well as 'additional' terms." *Westinghouse*, 647 F. Supp. at 900 n.3. I make the same assumption here.

Colo. Rev. Stat. § 4-2-207(3) provides,

> Conduct by both parties which recognizes the existence of a contract is sufficient
> to establish a contract for sale although the writings of the parties do not
> otherwise establish a contract.  In such case, the terms of the particular contract
> consist of those terms on which the writings of the parties agree, together with
> any supplementary terms incorporated under any other provisions of this title.

I conclude that both parties' conduct effectively recognized the existence of a contract under

subsection (3).  That leaves the task of determining which terms were actually agreed.

Because plaintiff's purchase order constituted an acceptance to defendant's price quote, I

find that plaintiff accepted defendant's terms and conditions.  "In the absence of fraud or

concealment, a party signing a contract cannot deny knowledge of its contents."  *Master

Palletizer Sys.*, 725 F. Supp. at 1531.  Likewise, when defendant submitted its order

acknowledgment form the day after receiving plaintiff's purchase order, it accepted plaintiff's

terms and conditions.  In such a case, the conflicting terms of defendant's price quote and

plaintiff's purchase order "eliminate each other and fall away from the contract."  *Westinghouse*,

647 F. Supp. 896, 901 (D. Colo. 1986) (citing *Daitom*, 741 F.2d at 1579).  If there were any

missing terms, the UCC would step in to fill the gaps in the contract.  *Id.*

3.  Defendant's Warranty, Limitations and Disclaimers.

Because plaintiff's terms and conditions are silent regarding warranties, limitations,

returns, and remedies, defendant's terms control.  Defendant's warranty reads, "Seller warrants

to Buyer that products sold by it will upon shipment conform to the description on the face

hereof and any written specifications expressly approved by Seller and be free from defects in

title, material and workmanship."  ECF No. 43-6 at 5.  Plaintiff contends that the pumps

delivered by defendant were not as warranted by defendant.  *Id.*  Rather, at least some of the

pumps (excluding the pumps whose cost were refunded per the agreement between the two

presidents) were defective. Defendant counters that plaintiff fully inspected and tested the '105 pumps before the first purchase; that the '108 pumps were an upgraded version; that the majority of the pumps did not fail; and that the others did not fail because of any defect in their design or manufacturing. These are genuine and material fact disputes.

Defendant also relies on two limitations that are included in the warranty section of its price quote. Before discussing those limitations, I note that plaintiff argues that these limitations were inconspicuous and should not be honored. ECF No. 46 at 10–11. For support, plaintiff cites cases from the Illinois Court of Appeals and the District of Nevada. Neither case persuades me. Rather, I find useful guidance in Colo. Rev. Stat. § 4-1-201(10) which states, "[w]hether a term is 'conspicuous' or not is a decision for the court." Colo. Rev. Stat. § 4-1-201(10). It then roughly defines a conspicuous term. There should be a heading "in contrasting type, font, or color," and the language in the body should be "in contrasting type, font, or color" so to call attention to the language. *Id.* I find that defendant's terms and conditions, including the warranty and its limitations, were conspicuous. The print was small but readable. The headings of the different sections, including section 3, "Warranty, Returns," were bolded.[4] The problem

---

[4] The Court attaches a screenshot of the two paragraphs at issue in defendant's terms and conditions.

**3. Warranty; Returns.** Seller warrants to Buyer that products sold by it will upon shipment conform to the description on the face hereof and any written specifications expressly approved by Seller and be free from defects in title, material and workmanship. **NO OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SHALL EXIST IN CONNECTION WITH ANY PRODUCTS SOLD BY SELLER, AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED.** Any claim by Buyer under Seller's warranty must be made in writing to Seller promptly upon discovery of any defect or non-conformity and in any event within 15 months from Seller's manufacturing date of the product or such claim shall be barred. Such claim must show the product model number and installation date and describe the defect or non-conformity and the date on which it occurred. Buyer's failure properly to install, service, maintain and operate the product will void Seller's warranty. No product shall be returned without prior authorization from Seller. Seller may, at its option, either inspect the product where located or authorize return of the product to Seller. All returns shall be shipped to Seller freight prepaid F.O.B. Seller's plant, Bellville, Ohio. On products determined defective or non-conforming under Seller's warranty for which timely claim has been made. Seller will reimburse Buyer for the shipping cost of authorized returns and will pay shipping costs on the repaired or replacement part or product. Buyer shall pay all shipping costs of all other returns and of all other repaired or replacement products.

**4. Exclusive Remedy; Limitation on Liability.** Seller shall, at its option, repair or furnish a replacement part or product for any product sold by Seller to Buyer which is defective or non-conforming under Seller's warranty and for which timely claim is made by Buyer as herein provided. The foregoing sets forth Buyer's sole remedy for any breach of Seller's warranty and for any defect in any product. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER SHALL IN NO EVENT BE LIABLE TO BUYER FOR LOSS OF USE OR PROFITS OR FOR ANY CONSEQUENTIAL DAMAGE RESULTING FROM THE USE, LOSS OF USE OR MALFUNCTION OF ANY PRODUCT SOLD BY SELLER, WHETHER OR NOT DUE TO SELLER'S NEGLIGENCE.

ECF No. 43-6, Ex. 6.

was not that the terms were inconspicuous but that Aqua-Hot seemingly did not pay attention to them at the time.

The first limitation on which defendant relies is the requirement that notice of a defective or non-conforming product must be given within 15 months after the manufacturing date of the product. Defendant notes that after September 2015 it heard nothing from Aqua-Hot about any alleged pump defects until it received a demand letter dated March 6, 2017. ECF No. 43 at 8. Because this was more than 15 months after the '108 pumps were manufactured, defendant argues that notice was untimely, and the warranty is void. *Id.* Plaintiff responds that this warranty restriction is invalid because the standard statute of limitations for a breach of contract claim in Colorado is three years. Colo. Rev. Stat. § 13-80-101. Further, Colorado's UCC states that the period of limitations "may not be varied by agreement of the parties." § 4-2-725(a). Defendant argues that the length of its warranty is an issue distinct from the applicable statute of limitations. Plaintiff provides no authority to the contrary.

I agree with the defendant. The statute governs when a legal claim for breach of warranty can be asserted; it does not change the length of the warranty. Nevertheless, I find that there is a genuine issue of fact as to whether plaintiff provided timely written notice of its express warranty claim. While it is undisputed that no pumps were manufactured after September 2015, a reasonable factfinder could conclude that plaintiff provided notice of the continuing pump failures. For example, in September 2015 when the presidents of the respective companies discussed the pump failures, Mr. Harter told Mr. Hill in an email that plaintiff already had to replace 2,500 pumps, and that this "number does continue to increase." ECF No. 46-1. A reasonable factfinder could determine that plaintiff put defendant on notice about impending future pump failures through its September 2015 communications.

The second relevant limitation is that the remedy for breach is limited to repair or replacement of the defective or non-conforming product. Plaintiff contends that this limitation of remedy is void because it has failed its essential purpose: the '108 pump that defendant offered as a replacement to the '105 pump failed at the same rate. ECF No. 46 at 14–15. For support, plaintiff cites a case from the District of Connecticut, where the court noted that "[w]hether a limited remedy failed of its essential purpose is, in most instances, a fact-laden issue inappropriate for determination on summary judgment." *McKernan v. United Techs. Corp., Sikorsky Aircraft Div.*, 717 F. Supp. 60, 69 (D. Conn. 1989).

In *McKernan*, the plaintiffs argued that "no amount of repair or replacement with similar [helicopter] engines would correct the inherent defect in the S-76A helicopter." *Id.* at 68. Whether that is true here is another genuine dispute of fact. On the one hand, plaintiff admits that the '108 pump had a 70% success rate. *See* ECF no. 46 at 12. On the other hand, apparently something like 30% failed. If that failure was because of a defect, and given that the '108 pumps were supposedly an upgrade over the '105 pumps, a reasonable factfinder could find that repair or replacement of the failed pumps is a remedy that fails of its essential purpose, which is to provide a non-defective pump. Further, one must wonder whether it is even feasible to repair or replace pumps in Aqua-Hot's customers' heating systems now.

Plaintiff also cites one sentence from *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 646 (10th Cir. 1991): "[O]ne situation in which a limitation of remedy to return of the purchase price has been held to fail of its essential purpose is when goods have latent defects which are not discoverable upon receipt and reasonable inspection."[5] Again, this simply raises a fact dispute. Plaintiff extensively inspected and tested the '105 pumps before it submitted its first purchase

---

[5] While *Lutz Farms* does cite this passage in a parenthetical, this quote comes from *Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 837 (Colo. App. 1988).

order. Does that mean that the alleged defects in about 30% of the delivered and installed pumps were not discoverable upon reasonable inspection? That is not a question that the Court can answer as a matter of law.

Notwithstanding the foregoing, plaintiff alleges that defendant extended two other express warranties after contract formation. First, it points to defendant's website. Defendant advertises that its "representatives are trained to help you select the proper pumps and related equipment for your specific application." ECF No. 46 at 12. Second, defendant sent an email to plaintiff following the '105 pump failures. In that email, defendant stated that its engineering team created the '108 pump that would "address all concerns" voiced by plaintiff. *Id.* Setting aside the vagueness of this alleged "warranty," defendant's original express warranty applies to every pump sold including the '108 pumps. Plaintiff has not explained how this alleged additional "warranty" supersedes the express warranty that is part of the contract.

    4. <u>Plaintiff's Implied Warranty Claims</u>.

Plaintiff's fifth claim for relief is for an alleged breach of the implied warranty of merchantability. ECF No. 1 at 7. Plaintiff's sixth claim for relief is for an alleged breach of the implied warranty of fitness for a particular purpose. *Id.*

A breach of the implied warranty of merchantability is governed by Colo. Rev. Stat. § 4-2-314. That section reads, "(1) Unless excluded or modified (section 4-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Colo. Rev. Stat. § 4-2-314. A breach of the implied warranty of fitness for a particular purpose is governed by § 4-2-315. That section provides that

> [w]here the seller at the time of contracting has reason to know any particular
> purpose for which the goods are required and that the buyer is relying on the
> seller's skill or judgment to select or furnish suitable goods, there is, unless

excluded or modified under section 4-2-316, an implied warranty that the goods shall be fit for such purpose.

Colo. Rev. Stat. § 4-2-315.  Notably, these two sections include an exception for sellers to exclude or modify warranties under certain circumstances.  As such, the validity of a warranty disclaimer is governed by § 4-2-316(2), which states that to exclude the implied warranty of merchantability, the disclaimer "must mention merchantability and in case of a writing must be conspicuous."  Colo. Rev. Stat. § 4-2-316(2).  To exclude the implied warranty of fitness, the disclaimer must simply be by a writing and conspicuous.  *Id.*

Here, the warranty section in defendant's price quote forms specifically excludes both warranties by name and with bolded capital letters.  Plaintiff asserts that defendant's exclusionary terms eliminating implied warranties of fitness for a particular purpose and merchantability, if valid, are unconscionable.  ECF No. 46 at 18.  The only case plaintiff cites is *Lutz Farms,* 948 F.2d at 646.  *Id.* at 19–20.  Moreover, to support its unconscionability argument, plaintiff simply rehashes its argument that the terms and conditions were not attached to defendant's order acknowledgments, that defendant never "pointed out" the warranty exclusions at the time plaintiff ordered the pumps, and that plaintiff never actually signed any agreement containing warranty disclaimers.  *Id.* at 19.  I have already rejected these arguments.  The Court expects that a reasonable, sophisticated merchant would read and understand a seller's one-page terms and conditions of sale.  Plaintiff points to no evidence and makes no argument that this contract was procedurally or substantively unconscionable.

Accordingly, summary judgment is granted in defendant's favor on plaintiff's fifth claim for breach of the implied warranty of merchantability and plaintiff's sixth claim for breach of the implied warranty of fitness for a particular purpose.

5. <u>Accord and Satisfaction</u>.

Defendant argues that plaintiff's contract and warranty claims are barred, in part, by the doctrine of accord and satisfaction.  ECF No. 43 at 9.  According to defendant, the payment to refund the 2,439 '105 pumps in September 2015 constituted an accord, and plaintiff's depositing the check constituted satisfaction of that accord.  *Id.*  Defendant contends that it made this payment to satisfy an existing, long-term customer.  ECF No. 43-19, Ex. 19.  Prior to sending the check, Mr. Hill (Gorman-Rupp president) asked Mr. Harter (Aqua-Hot president) to review his calculations, and Mr. Harter responded, "That agrees with what I have."  *Id.*  In his deposition, Mr. Harter admitted that he understood this payment was "compensation equal to the purchase price of all of the pumps that Aqua-Hot said it had to purchase from Gorman-Rupp that had failed in the field."  ECF No. 43-1, Ex. 1.

Following this payment, plaintiff asked defendant how to proceed should any subsequent pumps fail.  Mr. Hill stated that plaintiff should submit any additional warranty claims according to the previously established process in the terms and conditions.  ECF No. 43-20, Ex. 20.  However, an email produced during discovery shows that plaintiff internally decided in September 2015 that it would stop returning defective pumps to defendant.  ECF No. 43-21, Ex. 21.

"An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.  Performance of the accord discharges the original duty."  *R.A. Reither Const., Inc. v. Wheatland Rural Elec. Ass'n*, 680 P.2d 1342, 1344 (Colo. App. 1984).  To successfully establish an accord and satisfaction,

> it is necessary that the money should be offered in full satisfaction of the demand,
> and be accompanied by such acts and declarations as amount to a condition that

the money, if accepted, is accepted in satisfaction; and it must be such that the party to whom it is offered is bound to understand therefrom that if he takes it, he takes it subject to such conditions.

*Hudson v. Am. Founders Life Ins.*, 377 P.2d 391, 396 (Colo. 1962). Under Colorado law, whether the movant establishes an accord and satisfaction is a question of fact. *R.A. Reither Const*, 680 P.2d at 1344.

Here, defendant's accord and satisfaction defense is not amenable to summary judgment. Certainly, the parties resolved their issues concerning the pumps as to which the price was refunded. But as to the other '105 pumps, and the '108 pumps, the issue is whether "plaintiff accepted, retained, and cashed the check in question with the knowledge that the same was tendered by [] defendant on condition of being a payment in full of the account between the parties." *Gardner v. Mid-Continent Coal & Coke Co.*, 368 P.2d 204, 208 (Colo. 1962). A reasonable factfinder could infer from the presidents' exchange that plaintiff accepted that payment believing it satisfied only a portion of its warranty claim, especially considering Mr. Harter mentioned to Mr. Hill that the issues were ongoing. As such, defendant's accord and satisfaction defense cannot be sustained as a matter of law, but defendant may raise the defense at trial.

6. Plaintiff's Waiver Defense.

Defendant's terms and conditions expressly prohibit plaintiff from asserting consequential damages claims. Plaintiff argues that this term does not apply because defendant waived strict compliance by compensating plaintiff for the loss of 2,439 pumps in September 2015. ECF No. 46 at 17–18. To support its argument, plaintiff again cites *Lutz Farms* for the proposition that where a seller acts inconsistently with its own disclaimers and remedy limitations, that seller has waived those provisions. 948 F.2d at 646. In this case, however, the

evidence is that Gorman-Rupp agreed to make a one-time refund payment to satisfy the customer. There is no evidence that by doing so it was waiving the remedy provisions of its warranty for anything other than the one shipment of allegedly defective pumps. Waiver is a voluntary relinquishment of a known right. I do not find that there is a genuine issue of material fact as to whether defendant waived its right to insist on a repair or replacement remedy. Rather, I conclude that plaintiff's waiver defense fails as a matter of law.

      7. <u>Choice-of-Law Analysis</u>.

      One of the two relevant conflicting terms and conditions at issue in this case is the governing law section. Because of the conflict, the terms are removed from the contract for the reasons explained earlier. For the most part, as I have said, it's a moot point, due to the two states' mutual adoption of the UCC. However, plaintiff's third claim for relief is for willful and wanton breach of contract. Colorado recognizes such a claim, but Ohio does not. *Compare Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 300 P.3d 963, 971 (Colo. App. 2012), *with R & H Trucking, Inc. v. Occidental Fire & Cas. Co. of N. Carolina*, 441 N.E.2d 816, 818 (Ohio Ct. App. 1981). Therefore, I must resolve choice of law as to that issue.

      As a court sitting in diversity, I apply Colorado's choice-of-law rules. Colorado has adopted the principles set forth in the Restatement (Second) of Conflicts of Laws for resolving contract choice-of-law questions. *Wood Bros. Homes v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979). The Restatement (Second) looks for the state having the "most significant relationship" to the transaction. *Id.* To aid a court in its analysis, the Restatement (Second) provides certain factors or contacts to apply. Section 188, Law Governing in Absence of Effective Choice by the Parties, provides:

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Moreover, the Restatement (Second) provides provisions for particular contracts. Section 191, Contracts to Sell Interests in Chattel, provides:

The validity of a contract for the sale of an interest in a chattel and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

"This points, in the absence of express choice by the parties, to the place of delivery unless the considerations outlined in § 6 dictate another state has a more significant relationship with the transaction." *Richard O'Brien Cos. v. Challenge-Cook Bros.*, 672 F. Supp. 466, 469 (D. Colo. 1987).

The general choice-of-law principles found in § 6 do not sway me one way or the other. It appears from the briefs that most of the negotiating and contracting between these two merchants occurred over email and phone. Thus, most of the relevant contacts are evenly distributed between Ohio and Colorado. Because the purchase order and order acknowledgment forms both direct that the seller shall ship the pumps to Aqua-Hot's place of business in Fort Lupton, Colorado, Colorado law will govern this dispute going forward.

## B.  Breach of Contract and Willful and Wanton Breach of Contract Claims.

After incorporating all prior allegations in its complaint, plaintiff's breach of contract claim boils down to just three paragraphs.  ECF No. 1 at 4–5.  Paragraph 16 states,

> Aqua-Hot's purchase of [The Gorman-Rupp Company's ("GRC")] pumps was subject to GRC's express acknowledgement that the pumps shall conform to the specifications, descriptions and warranties of Aqua-Hot.  GRC also agreed to indemnify Aqua-Hot from "damages, claims and expenses" arising out of its work for which GRC, its employees and subcontractors are to any extent legally liable.[6]

The next paragraph simply declares that "GRC has breached its contract with Aqua-Hot." Defendant argues that plaintiff's contract-based claims fail because they are barred by defendant's terms and conditions.  ECF No. 43 at 11.

After reading plaintiff's complaint and summary judgment response, it remains unclear how plaintiff's breach of contract claims differs from its breach of express warranty claim. Perhaps there is an explanation that I have missed or that plaintiff will provide in due course.  At this point, while skeptical that there is a contract claim different from the warranty claim, I will leave that decision for another day.

## C.  Negligence Claim.

Defendant asserts that plaintiff's negligence claim fails as a matter of law under the economic loss rule because plaintiff seeks purely economic damages based on the parties' contractual relationship.  ECF No. 43 at 18.  Plaintiff responds that it properly alleged a negligence claim in addition to its breach of contract and implied warranty claims.  ECF No. 46

---

[6] The assertion that defendant agreed to indemnify plaintiff for any "damages, claims and expenses" seems legally relevant.  However, plaintiff provides no citation to this indemnification clause, and the Court is unable to locate any such clause in the parties' transactional documents.  Moreover, neither party references or argues the existence or validity of this clause.  Thus, any potential indemnification argument by plaintiff is waived.

at 20.  Plaintiff cites *Lutz Farms* again, where the Tenth Circuit upheld the district court's decision to submit the plaintiff's claim of negligence to the jury.  *Id.*

The Tenth Circuit applied Colorado law in *Lutz Farms* when it allowed the plaintiffs' negligence claim to proceed despite plaintiffs' loss being economic in nature.  948 F.2d at 641. However, *Lutz Farms*, decided in 1991, relied on a Colorado Supreme Court decision from 1986. *Id.*  But in 2000, the Colorado Supreme Court expressly adopted the economic loss rule as a matter of first impression.  *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).  The rule states that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."  *Id.*  The purpose of the economic loss rule is to "maintain a distinction between contract and tort law."  *Id.* at 1262.

Thus, the main inquiry for any economic loss rule defense is whether the tort claims "stem from a tort duty independent of the contract."  *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 605 (Colo. 2016).  To prove independence, a plaintiff must satisfy two conditions: "[f]irst, the duty must arise from a source other than the relevant contract; and [s]econd, the duty must not be a duty also imposed by the contract."  *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 627 (Colo. App. 2009) (citations omitted).

Here, it seems clear (and plaintiff does not argue to the contrary) that defendant's only duty arises from the relevant contracts and the warranty provisions I have discussed.  Because plaintiff solely seeks economic damages for its losses, the economic loss rule bars plaintiff's negligence claim as a matter of law.  Accordingly, summary judgment is granted for plaintiff's negligence claim.

## IV.  MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Plaintiff alleges that 5,223 Gorman-Rupp pumps were defective.  Of those pumps, plaintiff collected 1,006 pumps from its customers after those customers complained of pump failures.  Today, plaintiff has retained 504 of the 1,006 pumps.  ECF No. 42 at 2.  Defendant requests that this Court exclude any evidence regarding the missing pumps that defendant was unable to inspect prior to trial.  ECF No. 42 at 14–15.  The Court declines to do so.

Plaintiff bears the burden at trial of convincing the jury that defendant's pumps were defective.  The jury can evaluate plaintiff's decision—including the resources required and futility of collecting thousands of pumps—to collect less than 20% of the defective pumps, and its decision to retain only half of the 1,006 collected pumps.  Plus, plaintiff presents a plausible argument for its reason for not retaining more pumps: it had no intention of suing defendant until early 2017.  ECF No. 45 at 6–10.  Plaintiff represents that it has since retained all defective pumps once it concluded that litigation was imminent.  *Id.* at 10.

I find that plaintiff has met the objective standard of showing that litigation was not imminent until early 2017.  I further find that defendant will not be substantially prejudiced if I allow evidence to be presented at trial regarding all 5,223 defective pumps.  Accordingly, defendant's motion is denied.

## V.  MOTION TO STRIKE PLAINTIFF'S EXPERT WITNESS DISCLOSURES

Defendant's motion to strike concerns two expert witnesses that plaintiff intends to use at trial.  The first is Ami Levi, president of Acrux Metal Technology, Inc.  Plaintiff contacted Ms. Levi in April 2015 to analyze the debris accumulating in the pumps.  ECF No. 48 at 3.  Ms. Levi authored three written reports dated September 30, 2015, June 6, 2016, and May 30, 2017.  *Id.* at

3–4.  Plaintiff paid Ms. Levi a flat fee for each of her three examinations and reports.  *Id.* at 4.

Plaintiff contends that it hired Ms. Levi to assist in correcting the pump failures; it did not hire

her in anticipation of litigation.  *Id.*  The second expert is Karrie Ardolino.  Ms. Ardolino is the

program leader of Oneida Research Services.  Plaintiff hired Ms. Ardolino in August 2015 to

perform a CT scan on a small number of pumps to help identify the root cause of the pump

failures.  *Id.* at 4.  Like Ms. Levi, plaintiff paid Ms. Ardolino a flat fee for her work.  *Id.*

During discovery, plaintiff disclosed Mss. Levi and Ardolino as persons with knowledge

of the faulty pumps.  Plaintiff also attached their findings as part of plaintiff's expert disclosures.

*Id.* at 9.  Mss. Levi's and Ardolino's findings total 99 pages of documents, consisting of emails,

invoices, internal notes, and x-ray images.  *Id.*

Defendant moves to strike plaintiff's expert disclosures, and further asks the Court to

preclude plaintiff from calling Mss. Levi and Ardolino as expert witnesses because neither

witness submitted a written report as required by Fed. R. Civ. P. 26(a)(2)(B).  ECF No. 44 at 1.

Defendant argues Ms. Levi and Ardolino should be classified as retained experts, making them

subject to the requirements found in Rule 26(a)(2)(B).  *Id.* at 2.  If this is the case, because Mss.

Levi and Ardolino failed to submit written reports, they would be precluded from testifying at

trial as retained experts.  To supports its argument, defendant questions the timing of the experts'

hiring and filing of reports.  Plaintiff accepted its last shipment of Gorman-Rupp pumps in July

2015, and cancelled its remaining purchase orders on August 12, 2015.  This occurred after

plaintiff first hired Ms. Levi but before plaintiff hired Ms. Ardolino.  Then, plaintiff filed suit on

June 16, 2017, just weeks after Ms. Levi filed her third report on May 30, 2017.  Alternatively, in

the event this Court rules that Mss. Levi and Ardolino are non-retained experts, defendant argues

that plaintiff's disclosures still should be precluded because plaintiff failed to comply with Rule 26(a)(2)(C).

In response to the motion, plaintiff argues that Mss. Levi and Ardolino are non-retained experts and thus subject to Rule 26(a)(2)(C). Plaintiff's argument rests on the assertion that these experts were not hired for litigation purposes. Rather, they were hired to provide opinions about the pump failures in the normal course of business. ECF No. 48 at 6. Plaintiff declares that Mss. Levi and Ardolino have not and will not receive any compensation for testifying at trial as an expert witness. *Id.* at 2.

I accept plaintiff's representation that Mss. Levi and Ardolino were not retained solely to testify at trial. Even so, plaintiff must comply with Rule 26(a)(2)(C), which provides,

> (C) Witnesses Who Do Not Provide a Written Report. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C). I agree with defendant that plaintiff's disclosures fail this standard. Plaintiff argues that it did comply with the Rule because it identified specific pages and sections of the reports as to which the two expert witnesses would testify. The disclosure then stated that the experts would testify "consistent with their analyses." That is insufficient. Judge Blackburn made the same finding concerning the summary of facts and opinions requirement on a similar motion.

> A summary is defined as a brief account that states the main points of a larger body of information. By citing [internal] files as a summary of facts, the defendant identifies a large body of detailed information and, thus, fails to provide anything approaching a brief account or statement of the main facts on which his

experts will rely. Designation of such a prodigious volume of material does not constitute a summary of the facts to which the witnesses will testify within the meaning and requirements of Rule 26(a)(2)(C). To this extent, the Defendant's Disclosure does not comply with Fed. R. Civ. P. 26(a)(2)(C).

*Nicastle v. Adams Cty. Sheriff's Office*, No. 10-CV-00816-REB-KMT, 2011 WL 1674954, at *1

(D. Colo. May 3, 2011)

I reach the same conclusion here. If plaintiff wishes to present expert testimony from Mss. Levi and Ardolino, plaintiff must obtain and provide to the defendant an amended Rule 26(a)(2)(C) expert disclosure. I will extend the deadline for doing so, given this late decision on the parties' dispute, but because the December 17, 2017 trial date is looming, I impose a deadline of December 7, 2018 (normal business hours) for this purpose. I find that given the reports and analyses the two experts have already prepared, it should not be an onerous task for plaintiff's counsel to pull together a compliant disclosure. Likewise, given the information that has already been provided to the defendant, albeit in an insufficient form, I do not find that defendant will be unfairly prejudiced by the late date of provision of a compliant disclosure.

Accordingly, defendant's motion to strike plaintiff's expert disclosures is granted in part.[7] However, I elect not to preclude Mss. Levi and Ardolino from testifying at trial so long as plaintiff amends its expert disclosure reports according to my guidance.

## VI. MOTION IN LIMINE TO RESTRICT DEFENDANT'S EXPERT OPINIONS

Plaintiff filed this motion to exclude the testimony of Drs. James Mason and Raymond Thompson under Fed. R. Evid. 702. Defendant filed a response brief on November 23, 2018

---

[7] This motion is limited to Mss. Levi's and Ardolino's expert disclosure reports. Defendant elected not to challenge Gerard Miller's expert disclosure on the premise that plaintiff would supplement his disclosure. I note that defendant reserved its right to challenge Mr. Miller's disclosure. As such, the Court expects plaintiff to provide an update at the trial preparation conference concerning Mr. Miller's disclosure.

opposing plaintiff's motion.[8]  ECF No. 53.  Neither party has requested an evidentiary hearing or

oral argument.  Without a request, the Court may consider the motion on the briefs.  *See United

States v. Nacchio,* 555 F.3d 1234, 1251 (10th Cir. 2009).

Plaintiff's motion primarily concerns Dr. Mason's expert opinion.  ECF No. 49 at 6.  It

seeks to exclude all 23 opinions Dr. Mason included in his expert disclosure.  Plaintiff argues

that Dr. Mason's opinions based on actual scientific or technical conclusions are minimal, and

thus, his non-scientific opinions are nothing more than arguments that plaintiff's lawyers could

make at trial.  *Id.* at 10.  The motion also asks the Court to exclude part of Dr. Thompson's

expert opinion.  ECF No. 49 at 11.  Plaintiff objects to two proffered opinions based on

speculation, and plaintiff objects to a third opinion based on Dr. Thompson's opinion that

defendant made a "good faith" effort to correct any pump defects.  *Id.* at 11–13.

Defendant responds that plaintiff's motion fails to articulate how or why the expert

opinions fall short of the *Daubert* standards.  ECF No. 53 at 1.  It then argues that plaintiff

ignores the lengthy "discussion" section of Dr. Mason's report, and instead, it focuses only on

the "opinions" section.  *Id.* at 9.  However, for whatever reason, defendant issued a supplemental

report authored by Dr. Mason on November 20, 2018.  Dr. Mason stated in his declaration that

his updated report will "explain in greater detail how I reached the conclusions set forth in my

report, as already set forth in that document."  ECF No. 53-2 at 3.  Finally, defendant opposes

plaintiff's motion because plaintiff's challenges to both expert opinions go to the weight, not the

admissibility, of the opinions.  *Id.* at 11, 13.

---

[8] Plaintiff filed this brief on November 1, 2018.  The motion is not fully briefed because plaintiff has 14 days to reply to defendant's response brief.  However, given that the trial preparation conference for this case is scheduled for November 30, 2018, there isn't enough time to wait another 14 days for plaintiff to file a reply.  If plaintiff has an objection to my ruling, it should raise its objection at the trial preparation conference.

This motion is governed by Rule 702 of the Federal Rules of Evidence. Under Rule 702, a qualified expert may provide opinion testimony if his specialized knowledge would assist the jury in doing its job (factfinding), and the opinions are based on sufficient facts and reliable methods properly applied to the facts. Put another way, the evidence must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Expert opinions are relevant if they would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591. They are reliable if, in addition to the expert being qualified, his opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

The proponent of expert testimony has the burden to show that the testimony is admissible. *Nacchio*, 555 F.3d at 1241. The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). However, the trial court has discretion as to how to perform this gatekeeping function. *Id.* It is not a role that emphasizes exclusion of expert testimony. Judge Kane aptly summarized the thrust of *Daubert* in interpreting and applying Rule 702:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert*, was intended to relax traditional barriers to admission of expert opinion testimony. Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony. As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

With those broad principles in mind, I turn to the task of assessing the relevance, reliability, and, ultimately, the admissibility of the Drs. Mason's and Thompson's expert disclosures.

**A.** **Relevance of Dr. Mason's Opinion.**

For purposes of Rule 702, Dr. Mason's expert opinion is relevant if it would help the jury understand the evidence. According to defendant, it retained Dr. Mason to opine on four issues:

> (i) whether the pumps supplied by Gorman-Rupp performed to their stated specifications; (ii) whether Aqua-Hot subjected the pumps to operating conditions that exceeded their design specifications; (iii) whether Gorman-Rupp's efforts to identify the cause of the failures were consistent with the principles of root cause analysis; and (iv) whether the purported defects claimed by Aqua-Hot are supported by the factual record.

ECF No. 53 at 2. Defendant asserts that these issues are beyond the experience of an average layperson. *Id.* at 4.

Plaintiff's primary objection to the relevancy of Dr. Mason's testimony is that it is based on speculation. ECF No. 49 at 6. Plaintiff objects on speculation grounds to paragraphs 4, 6-12, 14, 16, 18-19, and 21-23. Plaintiff also objects that the opinions are duplicative.

I do not sustain plaintiff's objections. Plaintiff's objection to duplication is premature. If an expert's testimony begins to be repetitious, or if it is unduly duplicative of the opinions of a previous expert, the Court will sustain objections or intervene on its own to avoid an unnecessary waste of the jury's time. *See* Fed. R. Evid. 403.

Regarding the objection based upon alleged speculation, and having read Dr. Mason's supplemental report, I find that he more fully explains his reasoning and methodology for reaching his stated opinions. For example, concerning paragraph 4, where Dr. Mason opines that he has seen no evidence that either the '105 or '108 pumps failed to perform to their stated specifications, Dr. Mason states the following:

I reviewed materials reflecting the pumps' specifications and compared them with documents prepared by both Gorman-Rupp and Aqua-Hot evaluating and analyzing pumps that had apparently malfunction in the field, coupled with the parties' communications regarding those inquiries. I then analyzed whether the failure modes found by either party were consistent with the available data and whether that data reflected failures of the pump within their design specifications. My approach in this respect is consistent with the one I typically employ in such analyses – i.e., I compared technical data and information regarding a product's specifications with its operating environment to determine whether the product performed to its stated specifications and was subject to an environment consistent with those specifications.

ECF No. 53-2 at 4. His supplemental report goes on to explain in similar fashion his basis for forming his opinions set forth in paragraphs 5-8, 14-17, and 19-23.

I therefore find that Dr. Mason's testimony on the four issues identified in his reports are relevant in the sense that his opinions potentially will assist the jury in understanding the evidence concerning the quality of the pumps and in resolving the dispute concerning the alleged defects. Plaintiff's case rests on the assertion that defendant's pumps failed to meet their specification, and that defendant is to blame for the pump failures, not plaintiff or plaintiff's customers. Dr. Mason's testimony—where he compares the parties' actions with established scientific principles of engineering, materials science, and root cause analysis—will assist the jury in understanding the meaning and importance of the voluminous, technical records in this case.

**B. <u>Reliability of Dr. Mason's Opinion</u>.**

Expert opinions are generally deemed reliable for purposes of Rule 702 if the expert is qualified by knowledge, education, or experience, and the opinions are scientifically valid, if they are of a scientific nature, or otherwise have a reliable basis in the knowledge and experience of the expert's discipline. Dr. Mason holds a doctorate in solid mechanics along with lesser degrees in mechanical engineering and materials science and engineering. ECF No. 53 at 3. He

has 25 years of experience in the field, to include teaching mechanical engineering courses at the University of Notre Dame. *Id.* Plaintiff does not question Dr. Mason's qualifications. *See* ECF No. 49 at 2. However, plaintiff objects to Dr. Mason's testimony based on Rule 702(a), (b), and (c).[9]

Defendant's response argues that Dr. Mason's report is based on sufficient facts and data. ECF No. 53 at 4–5. Defendant points to 21 "materials reviewed" by Dr. Mason in forming his opinion. ECF No. 49-2 at 2. Defendant meets its burden here. Dr. Mason has sufficiently tied his opinions to facts or data provided by each party, and according to his reports, he will use his scientific and technical background to assist the jury in determining the cause of the pump failures in this case.

## C.  Relevance of Dr. Thompson's Opinion.

Plaintiff objects to two of Dr. Thompson's opinions based on speculation. First, in paragraph 3, Dr. Thompson appears to offer an opinion as to the cleanliness of plaintiff's "manufacturing and service environment." ECF No. 49 at 12. Plaintiff objects to this opinion because Dr. Thompson's report is not based on any inspection of plaintiff's manufacturing and service environment. *Id.* Defendant responds by alleging that this opinion is a result of Dr. Thompson's review of plaintiff's internal communications and documentation, which reveal several sources of debris that plaintiff identified but failed to address. ECF No. 53 at 13. Defendant argues that this information, coupled with Dr. Thompson's conclusion that defendant did not contaminate the pumps at its facilities, is sufficient for Dr. Thompson to deduce that plaintiff caused the contamination. *Id.*

---

[9] Plaintiff does not argue that Dr. Mason's opinions are not the product of reliable principles and methods per Rule 702(d).

Plaintiff's objection is sustained. Even if Dr. Thompson concludes that defendant did not cause the debris, that doesn't necessarily mean that plaintiff did. The jury may use its own deductive reasoning—just as Dr. Thompson did—to reach that conclusion, but defendant's expert witness cannot definitively opine that plaintiff's manufacturing and service environment was unclean without inspecting plaintiff's facilities himself. I fail to see how internal documents could definitively show that.

Turning to plaintiff's next objection, plaintiff objects to Dr. Thompson's opinion that it would be nearly impossible for defendant to identify the root cause of the debris in the pumps without sufficient information about the operating environments with which plaintiff's customers subject the pumps. ECF No. 49 at 13. But as defendant argues, Dr. Thompson's report explains his analysis. For example, he explains that dissolved metals such as copper and aluminum were found in the bluish coatings and debris inside the pump, and the likely source of this corrosive metal came from internal parts of plaintiff's larger heating system. ECF No. 53 at 15. This testimony is relevant to the underlying cause of the pump failures. If plaintiff wishes to challenge Dr. Thompson's testing or analysis, it may do so on cross examination. In the meantime, this objection is overruled.

### D. <u>Reliability of Dr. Thompson's Opinion</u>.

Dr. Thompson holds a Ph.D. in materials science and engineering, and he is a registered professional engineer. ECF No. 53 at 12. Like Dr. Mason, plaintiff does not challenge Dr. Thompson's qualifications. ECF No. 49 at 2. However, plaintiff objects to one opinion on reliability grounds. Plaintiff suggests that Dr. Thompson's opinion that defendant used "good faith" to find a solution for the pump failures is not proper for an expert opinion. *Id.* at 13. Defendant's response argues that Dr. Thompson's good faith reference is nothing more than a

summary of his more detailed discussion and evaluation of the testing conducted by both parties. ECF No. 53 at 14. Dr. Thompson ultimately concludes that defendant's internal debris testing was sound. *Id.*

Plaintiff's objection is sustained. If Dr. Thompson's conclusion is that defendant's internal testing was sound, he should say that. It is for the jury to decide if defendant acted in good faith.

## ORDER

(1) Defendant's motion for summary judgment, ECF No. 43, is GRANTED as to claims two, five, and six, but it is DENIED as to claims one, three, and four.

(2) Defendant's motion for sanctions for spoliation of evidence, ECF No. 42, is DENIED.

(3) Defendant's motion to strike plaintiff's expert witness disclosures, ECF No. 44, is GRANTED in part and DENIED in part.

(4) Plaintiff's motion in limine to restrict expert opinions, ECF No. 49, is GRANTED in part and DENIED in part.

DATED this 29th day of November, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge